J-S36001-16
J-S36002-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF: D.P.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: E.K.T., MOTHER | No. 2205 MDA 2015 |

Appeal from the Decree November 18, 2015
In the Court of Common Pleas of York County
Orphans' Court at No(s): 2015-0093

| | |
|---|---|
| IN THE INTEREST OF: D.P.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: E.K.T., MOTHER | No. 2215 MDA 2015 |

Appeal from the Order Entered November 18, 2015
In the Court of Common Pleas of York County
Juvenile Division at No(s): CP-67-DP-0000143-2014

BEFORE:  MUNDY, J., DUBOW, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY MUNDY, J.:                    **FILED JUNE 15, 2016**

Appellant, E.K.T. (Mother), appeals from the November 18, 2015

decree involuntarily terminating her parental rights, and the order entered

_____

[*] Former Justice specially assigned to the Superior Court.

the same day, changing the permanency goal to adoption with respect to her son, D.P.M., born in March 2014.[1]  After careful review, we affirm.[2]

D.P.M. was removed from the home of Mother and Father on July 17, 2014, when he was four months old, due to domestic violence between his parents, as well as Mother's drug and alcohol abuse, and her mental health issues.  Trial Court Opinion, 11/18/15, at Finding of Fact ¶ 10; N.T., 10/1/15, at 54-55.  The trial court adjudicated him dependent on September 11, 2014.

The permanency goal for D.P.M. was reunification.  CYF established the following Family Service Plan (FSP) goals for Mother: to obtain stable housing and employment, to obtain drug and alcohol evaluations and to follow any recommendations, to provide negative drug screens, and to address mental health concerns.  N.T., 10/1/15, at 56-57.

Permanency review hearings occurred on December 18, 2014, May 28, 2015, and November 2, 2015, which resulted in orders finding that "Mother had made minimal progress towards alleviating the circumstances which

_____

[1] J.M. (Father) executed a consent for the adoption of D.P.M. on May 28, 2015, which was confirmed by decree of the trial court dated October 1, 2015.  In addition, C.R. (Putative Father) executed a consent subsequent to the subject proceedings, which was confirmed by decree dated December 10, 2015.  Neither Father nor Putative Father filed notices of appeal.

[2] We observe that the York County Offices of Children, Youth and Families (CYF) and the guardian *ad litem* (GAL) filed a joint brief in support of the involuntary termination decree and the goal change order.

necessitated the original placement." Trial Court Order, 12/18/14, at 1; Trial Court Order, 5/28/15, at 1; Trial Court Order, 11/2/15, at 1. In the final two permanency review orders, the trial court found that Mother was in minimal compliance with her FSP goals. Trial Court Order, 5/28/15, at 1; Trial Court Order, 11/2/15, at 1.

On July 30, 2015, CYF filed a petition for the involuntary termination of Mother's parental rights and a petition for a goal change to adoption. A hearing on the petitions was held on October 1, 2015, during which CYF presented the testimony of Kimberly Myers, a drug and alcohol monitor at Families United Network (FUN); Katrina Weeden and Laura Bosley, in-home family therapists at Pressley Ridge; and Mitra Honardoost, a CYF caseworker. Mother testified on her own behalf.

On November 18, 2015, the trial court involuntarily terminated Mother's parental rights. That same day, the trial court changed the permanency goal to adoption. Mother timely filed separate notices of appeal and concise statements of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i). The trial court filed its Rule 1925(a) opinion on January 6, 2016.[3]

On appeal, Mother presents three questions for our review.

---

[3] On January 7, 2016, this Court consolidated these appeals *sua sponte*. **See generally** Pa.R.A.P. 513.

I. Whether the trial court erred in changing the goal from reunification to adoption and termination of parental rights without clear and convincing evidence that a change of goal would best serve the interests of the child[?]

II. Whether the trial court erred in terminating [Mother's] parental rights without clear and convincing evidence that termination best served the emotional needs and welfare of the child[?]

III. Whether [CYF] failed to present clear and convincing evidence that termination of [Mother's] parental rights best served the emotional needs and welfare of the child[?]

Mother's Brief at 4.

We begin our review with the goal change order, which we consider according to the following standard.

In cases involving a court's order changing the placement goal… to adoption, our standard of review is abuse of discretion. To hold that the trial court abused its discretion, we must determine its judgment was manifestly unreasonable, that the court disregarded the law, or that its action was a result of partiality, prejudice, bias or ill will. While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Therefore, our scope of review is broad.

*In re S.B.*, 943 A.2d 973, 977 (Pa. Super. 2008) (citations omitted), *appeal denied*, 959 A.2d 320 (Pa. 2008); *see also In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

This matter is controlled by the Juvenile Act, 42 Pa.C.S. §§ 6301-6375, which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA"), 42 U.S.C. §§ 620-679. *In re M.S.*, 980 A.2d 612, 615 (Pa. Super. 2009), *appeal denied*, 985 A.2d 220 (Pa. 2009). We have recognized that "[b]oth statutes are compatible pieces of legislation seeking to benefit the best interest of the child, not the parent. … ASFA promotes the reunification of foster care children with their natural parents when feasible …. Pennsylvania's Juvenile Act focuses upon reunification of the family, which means that the unity of the family shall be preserved 'whenever possible.'" *Id.*, *citing* 42 Pa.C.S.A. § 6301(b)(1). As such, child welfare agencies are required to make reasonable efforts to return a foster child to his or her biological parent. *In re N.C.*, 909 A.2d 818, 823 (Pa. Super. 2006). When those efforts fail, the agency "must redirect its efforts toward placing the child in an adoptive home." *Id.*

At permanency review hearings for dependent children removed from the parental home, a trial court must consider the following factors.

### § 6351. Disposition of dependent child

…

**(f) Matters to be determined at permanency hearing.—**

At each permanency hearing, a court shall determine all of the following:

> (1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

…

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child….

42 Pa.C.S.A. § 6351(f)(1)-(6), (9). "These statutory mandates clearly place the trial court's focus on the best interests of the child." *In re S.B.*, *supra* at 978 (citation omitted). We have stated, "[s]afety, permanency, and well-being of the child must take precedence over **all** other considerations." *Id.* (citation omitted) (emphasis in original). Moreover, the burden is on the

child welfare agency "to prove the change in goal would be in the child's best interest." *In re D.P.*, 972 A.2d 1221, 1227 (Pa. Super. 2009), *appeal denied*, 973 A.2d 1007 (Pa. 2009).

Instantly, Mother argues the trial court erred "[b]y not considering the extent of progress [she] was to make [sic] towards alleviating the circumstances which necessitated the original placement of [D.P.M.]" Mother's Brief at 9. We conclude that Mother's argument is without merit. Indeed, in its opinion that accompanied the goal change order, the trial court found that Mother made minimal progress towards alleviating the circumstances necessitating the child's placement. Trial Court Opinion, 11/18/15, at 9.

> Mother is currently residing with [her] grandmother but it is uncertain whether this living arrangement is long-term. Since the adjudication of dependency Mother has had sporadic employment. Mother has made no progress in addressing her mental health issues. The Discharge Summary from Holy Spirit Hospital in February 2013 indicates that Mother was diagnosed with psychotic disorder and substance abuse. Mother obtained a drug and alcohol evaluation from Guadenzia Westshore Outpatient Program on March 24, 2015. Said evaluation recommended intensive outpatient counseling. Mother was diagnosed with Posttraumatic Stress Disorder on October 31, 2014 and it was recommended that Mother participate in individual therapy. Mother failed to follow through with the recommendations for individual counseling and testified that she does not believe she has any mental health or substance abuse issues.
>
> Mother was drug tested by [FUN] from July 19, 2014 through the present. Since July 19, 2014, FUN

> attempted to test Mother 63 times and was able to successfully test Mother 37 times. Of the successful tests, Mother tested positive on 25 occasions. Mother's last negative drug test was April 16, 2015. Mother tested positive on October 1, 2015, the date of the [t]ermination of [p]arental [r]ights [h]earing. Additionally, Mother did not work with her assigned in-home teams. Testimony established that Mother was uncooperative and repeatedly refused their services.

*Id.* The testimonial evidence of all of the witnesses overwhelmingly supports the trial court's findings.

Specifically, Ms. Honardoost testified that Mother has not made any progress in addressing the issues that initially caused D.P.M.'s placement. N.T., 10/1/15, at 72. She testified on direct examination as follows.

> Q. Is [M]other in a position today to obtain physical custody of the minor child?
>
> A. No.
>
> Q. Why is that?
>
> A. Due to ongoing drug use and mental health concerns that have not been fully addressed….
>
> Q. Why would termination of [M]other's parental rights be in the best interest of the minor child?
>
> A. The minor child needs permanency. He has been in care for over a year now….

*Id.*

Moreover, on inquiry by the trial court, Mother testified to the following.

Q. If [D.P.M.] was in your care today, do you believe he would be safe in your care today?

A. It would take a lot of help, but yes. I can't do it on my own.

Q. So you're currently not able to provide care for him on your own?

A. Not by myself without some help, no.

Q. Approximately how long do you think it would take for you to be able to care for [D.P.M.] on your own?

A. I wish I could tell you.

*Id.* at 123. Further, Mother testified as follows on cross-examination by the GAL.

Q. You said that you don't think you have a drug problem, correct?

A. I think my problem is a lot bigger than that, sir.

Q. I'm sorry.

A. I think my problem is a lot bigger than a drug problem.

*Id.* at 120.

The record demonstrates that D.P.M. was 19 months old by the time of the subject proceedings. He had been in placement since he was 4 months old, for a total of 15 months. During those months, Mother failed to comply with her FSP goals. Her illegal drug use continued, and her mental health remained problematic. As such, we discern no abuse of discretion by the

court in concluding that D.P.M.'s best interests demanded that the goal be changed from reunification to adoption. *See S.P.*, *supra*.

We next address the decree of involuntary termination, which we also consider according to an abuse of discretion standard. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted). Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Mother's parental rights pursuant to Section 2511(a)(1), (2), (5), (8), and (b), which provide as follows.

**§ 2511. Grounds for involuntary termination**

**(a) General Rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

- 10 -

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

…

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

…

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

…

> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A § 2511(a)(1), (2), (5), (8), (b).

Mother argues that "[e]ven if the Agency did meet its burden under Section 2511(a), the trial court did not adequately consider the second prong of the bifurcated process which was to determine the needs and welfare of [D.P.M.] under the standard of best interests of [D.P.M.]" [4] Mothers' Brief at 12. Mother relies on the testimony of the CYF caseworker, Mitra Honardoost, who testified, "the visits [between Mother and D.P.M.] -- go fairly well. Mother and [D.P.M.] appear to have a bond. And the affection is appropriate. Everything is appropriate." *Id.* at 12, *citing* N.T., 10/1/15, at 63. Mother acknowledges that Ms. Honardoost testified that D.P.M.'s bond is stronger with his foster family than with Mother. However,

---

[4] Because Mother does not argue on appeal that the trial court abused its discretion with respect to Section 2511(a), we do not address it.

Mother argues, "there was no evidence presented that such a young child (approximately a year and a half) would not transfer that bond back to his mother should he be reunified. Given the child's age, there is no evidence that the child would suffer any specific emotional[] setbacks should he be removed from the foster mother's care." *Id.* at 12-13.

With respect to Section 2511(b), this Court has explained the requisite analysis as follows.

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

Significantly, we have held the following.

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse,

is able to sift through the emotional wreckage and completely disavow a parent…. Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted).

Further, our Supreme Court explained that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, *supra* at 268. Moreover, the Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id*. at 269. The *T.S.M.* Court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail … the result, all too often, is catastrophically maladjusted children." *Id*.

In its opinion that accompanied the decree, the trial court stated as follows, which the testimonial evidence supports.

The [trial c]ourt has thoroughly evaluated [D.P.M.]'s relationships in this matter. The [trial c]ourt finds that Mother has a bond with [D.P.M.] but that the bond has weakened since [D.P.M.]'s placement. At this point, the [trial c]ourt believes that some level

> of bond remains between Mother and [D.P.M.] but that [D.P.M.] will not be negatively impacted by the termination of Mother's parental rights. The [trial c]ourt also finds that the bond between [D.P.M.] and foster parent is strong and healthy. Testimony established that [D.P.M.] is happy and feels comfortable in their care. [D.P.M.] knows who his Mother is but it is the foster parents who take care of his daily needs and act as [D.P.M.]'s parental figures. The bond that [D.P.M.] has with the foster parent can provide safety, security and permanency for the child. Termination of parental rights will best meet the needs of the child and permit the child to achieve the stability that he deserves.

Trial Court Opinion, 11/18/15, at 14.

Ms. Honardoost testified that Mother has been "fairly consistent" in her weekly three-hour supervised visits with D.P.M. N.T., 10/1/15, at 62. Although she testified Mother is appropriate during the visits, and that Mother and D.P.M. "appear to have a bond," Ms. Honardoost agreed "the stronger bond lies" between D.P.M. and the foster family. *Id.* at 67. She testified that she has "heard [D.P.M.] call the foster mother mom," who is also a pre-adoptive resource. *Id.* at 65, 73.

We conclude that the totality of the record evidence supports the court's decision that, based on "Mother's unaddressed mental health and substance abuse issues," terminating her parental rights will serve the needs and welfare of D.P.M. pursuant to Section 2511(b), in that it "will allow [him] to achieve the safety, security, and permanency he deserves." Trial Court Opinion, 1/6/16, at 2; *see In re M.T.*, 101 A.3d 1163, 1182 (Pa. Super. 2014) (*en banc*) (addressing the parents' "inability to consistently

- 15 -

provide a safe and secure environment for their children" as part of its Section 2511(b) analysis); *see also In re Adoption of C.D.R.*, 111 A.3d 1212, 1220 (Pa. Super. 2015) (concluding the mother's bond with the child was outweighed by the mother's "repeated failure to remedy her parental incapacity," and by the child's need for permanence and stability).

Based on the foregoing, we conclude the trial court did not legally err or abuse its discretion in terminating Mother's parental rights to D.P.M., and changing the permanency goal to adoption. *See T.S.M.*, *supra*; *S.B.*, *supra*. Accordingly, we affirm the trial court's November 18, 2015 decree and order.

Decree affirmed. Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/15/2016

- 16 -